**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| TONI DUPLANTIS, on behalf of herself and all others similarly situated, | |
| | Case No. |
| Plaintiff, | |
| v. | **CLASS ACTION** |
| HUBBARD RADIO WASHINGTON DC, LLC d/b/a WTOP NEWS, and HUBBARD BROADCASTING INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Toni Duplantis ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action lawsuit against Hubbard Radio Washington D.C., LLC d/b/a WTOP News and Hubbard Broadcasting Inc. (collectively "Hubbard" or "Defendants") for violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's claims arise from Hubbard's practice of knowingly disclosing its digital subscribers' personally identifiable information and viewed video media (collectively, "Personal Viewing Information") to a third party, Meta Platforms, Inc. ("Facebook"). Plaintiff's allegations are based on personal knowledge as to herself and her own acts and upon information and belief as to all other matters, including further investigation by Plaintiff's attorneys.

## NATURE OF THE ACTION

1.     This is a consumer digital privacy class action complaint brought on behalf of all persons with Facebook or Instagram accounts who have digital subscriptions to, and have watched

videos on, www.WTOP.com ("*WTOP News*"), a multimedia website owned and operated by Hubbard.

2.      Plaintiff brings this action in response to Hubbard's practice of knowingly disclosing its subscribers' personally identifiable information—including a record of every video clip they view—to Facebook without first obtaining its subscribers' express consent in a stand-alone consent form that complies with the VPPA's statutory requirements.

3.      Hubbard used first-party and third-party cookies, software development kits ("SDK"), pixels, Facebook's Business Tools, including Advanced Matching and Conversion API, to purposely track, record, collect, and transmit its digital subscribers' interactions with *WTOP News*. Hubbard purposely sent its digital subscribers' viewing history and personally identifiable information to its third-party business partners, including Facebook.

4.      Hubbard installed the Facebook Pixel tool onto the *WTOP News* website and controlled which types of information and data would be tracked and transmitted to Facebook. In conjunction with this, Hubbard purposefully and specifically chose to: (1) track and record its digital subscribers' viewed video media, (2) disclose that information to Facebook[1] alongside its digital subscribers' individual FIDs, and (3) engaged in this practice without its digital subscribers' knowledge or consent.

5.      Importantly, Hubbard shared the Personal Viewing Information—i.e., digital subscribers' unique FIDs and video content viewed—*together as one data point to Facebook*. Because a digital subscriber's FID uniquely identifies their individual Facebook user account, Facebook, or any other ordinary person, can use it to quickly and easily locate, access, and view a

---

[1] Notably, Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Hubbard transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers. Additional copies of this information are communicated through the use of cookies.

digital subscriber's corresponding Facebook profile. Put simply, Hubbard has shared its digital subscribers' viewed video media in a manner that allows third parties to know each and every video an individual has viewed on *WTOP News*.

6.     Hubbard profited from its practice of disclosing digital subscribers' Personal Viewing Information to Facebook, and it did so at the expense of its digital subscribers' privacy and their statutory rights under the VPPA.

7.     Because *WTOP News* digital subscribers were not informed about this dissemination of their Personal Viewing Information—indeed, it was automatic and *invisible*—they could not exercise reasonable judgment to defend themselves against the highly personal ways *WTOP News* has used such data for its own benefit.

8.     Hubbard chose to disregard Plaintiff's and hundreds of thousands of other *WTOP News* digital subscribers' statutorily protected privacy rights by releasing their sensitive data to Facebook. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress Hubbard's practices of intentionally disclosing its digital subscribers' Personal Viewing Information to Facebook in knowing violation of VPPA.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

10.    This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Hubbard.

11.     This Court has personal jurisdiction over Hubbard because its principal place of business is within this District and it has sufficient minimum contacts in Maryland to render the exercise of jurisdiction by this Court proper and necessary.

12.     Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because Hubbard does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District. Further, Plaintiff resided within this judicial district at all times material hereto.

## PARTIES

13.     Plaintiff Toni Duplantis is an adult citizen of Louisiana and is domiciled in Houma, Louisiana. Plaintiff has been a *WTOP News* digital subscriber for approximately one year and has had a Facebook account since at least 2006. During the relevant time period, Plaintiff Duplantis used her *WTOP News* digital subscription to request and view video media on the *WTOP News* website and app. By doing so, Plaintiff's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Plaintiff never gave Hubbard express written consent to disclose her Personal Viewing Information, and she was unaware that such information was being shared with Facebook.

14.     Defendant Hubbard Radio Washington D.C., LLC d/b/a *WTOP News* is a wholly owned subsidiary of Hubbard Broadcasting Incorporated, an American media company that owns and operates over 50 media stations and maintains regional offices in several states, including Maryland. In 2011, Hubbard Broadcasting Inc. acquired *WTOP News* and 16 other media stations for $505 million, and the company's annual revenue is approximately $312.1 million. As of 2020, *wtop.com*[2] was one of the most prominent news sites in the United States. As detailed below,

---

[2] The *WTOP News* website includes *live.wtop.com* which provides a broad selection of audio content and news videos that are posted alongside news articles.

through the *WTOP News* website and app, Hubbard delivers and is in the business of delivering, countless hours of video content to its digital subscribers.

## FACTUAL ALLEGATIONS

### I. Background of the Video Privacy Protection Act

15.     The VPPA prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief and attorney's fees.

16.     The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

17.     Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

18.     In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books

that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

19.     While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[3]

20.     Here, Hubbard violated Plaintiff and the Class members' privacy rights by systematically disclosing their Personal Viewing Information to Facebook, without obtaining appropriate consent.

## II. Hubbard is a Video Tape Service Provider

21.     Just like "department store[s]," "golf shop[s]," and "continuity club[s]," which the VPPA's legislative history suggests may qualify as video tape service providers, Hubbard is a video tape service provider. *See* S. Rep. 100-599, at 12-13.

---

[3] The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the21stcentury   (last accessed March 15, 2022).

22.     Hubbard is a multimedia organization that provides news, entertainment, and commentary across multiple brands and platforms.[4] When describing its impact in the context of local and national news, Hubbard distinguishes itself from its competitors, stating, "What makes Hubbard special is the connection to the local communities we serve. We were born to entertain. We attract a huge audience through TV and Radio broadcasting, satellite, digital and events."

23.     One such platform is *wtop.com*, which features "Entertainment," "Sports," "Local News," and "National" news content.

24.     Through *wtop.com*, Hubbard creates, hosts, and disseminates hundreds, if not thousands, of videos.

25.     On the homepage, for example, Defendant features a section dedicated to video content:



---

[4] "Now celebrating four generations and a deep history including the formation of the first national radio news service, to the purchase of the first television camera ever sold, to the innovation of Satellite News Gathering and broadcasting high-power DBS programming direct to U.S. homes, Hubbard Broadcasting continues to develop innovative ways to connect with the people and communities it serves through the medium of broadcasting." https://hubbardbroadcasting.com/company/corporate/ (last accessed Sept. 26, 2022).

26.     Defendant monetizes this content by playing an advertisement before each video:



## III. Plaintiff and Class Members are Consumers

27.     To access content on wtop.com, individuals must share identifying information and pay money on a recurring basis. By doing so, individuals subscribe to Defendant's website.

## IV. Hubbard Knowingly Disclosed Subscribers' PII to Facebook

28.     Hubbard knowingly disclosed its subscribers' PII to Facebook. At a minimum, Hubbard did this through Facebook's Tracking Pixel and Business Tools, including Advanced Matching and Conversion API.

29.     Facebook's Tracking Pixel and related business tools are invisible to website users and consumers. Additionally, Facebook gives website operators, such as Hubbard, control over the categories of information and data their website tracks, records, and sends to Facebook. Hubbard's knowledge as to its conduct is evidenced by: (1) the fact that it chose to track its digital

subscribers' interactions with *wtop.com*, including the videos they viewed; (2) it requested lines of code that achieved this purpose; (3) it obtained lines of code from Facebook in order to achieve this purpose; and (4) it subsequently installed those lines of code on *wtop.com*.

**A.      WTOP News' Digital Subscriptions**

30.     To subscribe to *WTOP News*, users sign up for an online newsletter by providing their personal information, including their name, date of birth, email address, and zip code:



31.     On information and belief, all digital subscribers also provide Hubbard with their IP address[5] that informs Hubbard as to subscribers' city, zip code and physical location.

32.     Digital subscribers may also provide to Hubbard the identifier on their mobile devices and/or cookies stored on their devices.

33.     Hubbard did not disclose that it shared its digital subscribers Personal Viewing Information with third parties, such as Facebook, during the registration process or when digital subscribers logged in and viewed video media.

34.     Notably, Hubbard never obtained its digital subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

35.     Nonetheless, Hubbard admits that it collects and discloses its digital subscribers' information to third parties. The operative Privacy Policy for *WTOP News* states that it collects "Information" from its user's devices:

> Depending on how you use our Platforms, we may collect: your name, birth date, gender, email address, zip code, and any other information you may voluntarily provide to us (for example: your street address or telephone number, or your "friends" or contacts that you agree to allow us to access).  We may also gather information from the device you use when interacting with our Platforms, such as your location or I.P. address. We may gather this information in a variety of ways, such as when you email us, create a user profile, register for our web or mobile app live stream, or enter a sweepstakes or contest.[6]

36.     However, *WTOP News* Terms of Service and Privacy Policy failed to disclose that Hubbard shared its digital subscribers' private and protected Personal Viewing Information with third parties, including Facebook.

---

[5] An IP address unique number assigned to all information technology connected devices.

[6] *See* https://corporate.hubbardradio.com/privacy-policy/(last accessed June 2, 2022).

**B. Facebook and the Facebook Tracking Pixel**

37.     Websites and apps use Facebook's pixel and SDK to collect information about user's devices and activities and send that to Facebook. Facebook then uses that information to show the user targeted ads.

38.     The Facebook tracking pixel, also known as a "tag" or "web beacon" among other names, is invisible to ordinary consumers but tracks their actions on Facebook advertisers' websites and reports them to Facebook. It is a version of the social plugin that gets "rendered" with code from Facebook. To obtain the code for the pixel, the website advertiser tells Facebook which website events it wants to track (e.g., video views) and Facebook returns corresponding Facebook pixel code for the advertiser to incorporate into its website.

39.     Hubbard installed the Facebook tracking pixel, which enabled it to disclose Plaintiff's and Class Members' Personal Viewing Information to Facebook, because it benefitted financially from the advertising and information services that stem from use of the pixel. When a *WTOP News* digital subscriber entered the website and watched video media on the website, the website sent to Facebook certain information about the viewer, including, but not limited to, their identity and the media content the digital subscriber watched. Specifically, *WTOP News* sent to Facebook the video content name, its URL, and, most notably, the viewers' Facebook ID.

40.     The Facebook ID ("FID") is a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. When a Facebook user with one or more personally identifiable FID cookies on his or her browser viewed video media from *WTOP News* on the website or app, *WTOP News*, through its website code, caused the digital subscriber's identity and viewed video media to be transmitted to Facebook by the user's browser. This transmission was not the digital subscriber's decision, but resulted from Hubbard's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code

into *WTOP News'* website or app. Hubbard could have easily programmed the website and app so that this information was not automatically transmitted to Facebook when a subscriber views video media. However, it was not in Hubbard's financial interest to do so because it benefits financially by providing this highly sought-after information.

41.     Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Hubbard knowingly and readily provided to Facebook without any consent from the digital subscribers—any ordinary person could learn the identity of the digital subscriber and the specific video or media content they requested on *WTOP News'* website.

42.     At all relevant times, Hubbard knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the pixel, including that it enabled *WTOP News'* website and app to show targeted advertising to its digital subscribers based on the products those digital subscribers had previously viewed on the website or app, including video media purchases, for which Hubbard received financial remuneration.

### C. Hubbard and the Facebook Pixel

43.     Hubbard maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the video media that each of its digital subscribers viewed.

44.     The data Hubbard shared with Facebook is not anonymized. To the contrary, the data it disclosed is tied to unique identifiers that track specific Facebook users. Importantly, the

recipient of the Personal Viewing Information—Facebook—*receives the Personal Viewing Information as one data point*. Hubbard thus monetized its database by disclosing its digital subscribers' Personal Viewing Information to Facebook in a manner allowing it to make a direct connection—without the consent of its digital subscribers and to the detriment of their legally protected privacy rights.

45.     Critically, the Personal Viewing Information Hubbard disclosed to Facebook allows Facebook to build from scratch or cross-reference and add to the data it already has in their own detailed profiles for its own users, adding to its trove of personally identifiable data.

46.     These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, a user could visit the *WTOP News* website during the Class Period and click on an article titled "DC Sports Huddle: Can Washington make another NFL playoff push?" to watch the video in the article.



47.     As demonstrated below, once the user clicked on and watched the video in the article, *WTOP News* sent the content name of the video the digital subscriber watched, the URL, and the digital subscriber's FID ("c_user=____") to Facebook.



48.     As a result of Hubbard's data compiling and sharing practices, Hubbard knowingly disclosed to Facebook for its own personal profit the Personal Viewing Information of Hubbard's digital subscribers, together with additional sensitive personal information.

49.     Hubbard does not seek its digital subscribers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its customers remain unaware that their Personal Viewing Information and other sensitive data was disclosed to Facebook.

50.     By disclosing its digital subscribers Personal Viewing Information to Facebook—which undeniably reveals their identity and the specific video materials they requested from Hubbard's website —Hubbard has intentionally and knowingly violated the VPPA.

51.     Tracking pixels are not necessary for Hubbard to operate *WTOP News'* digital news publications and sign-up digital subscriptions.  They were deployed on Hubbard's website for the sole purpose of enriching Hubbard and Facebook.

52.     Even if an online news publication found it useful to integrate Facebook tracking pixels, Hubbard is not required to disclose Personal Viewing Information to Facebook. In any event, if Hubbard wanted to do so, it must first comply with the requirements of VPPA, which it failed to do.  As noted above, even Facebook forbids the disclosure of such information without first complying specifically with the VPPA (and relevant state laws).

**D. Plaintiff's WTOP Subscription**

53.     Plaintiff Toni Duplantis became a digital subscriber to *WTOP News* by providing, among other information, her name, address, email address, IP address (which informs Hubbard as to the city and zip code she resides in as well as her physical location), and any cookies associated with her device. As part of her subscription, she receives emails and other news alerts from *WTOP News*.

54.     During the last year, Ms. Duplantis has used her smart phone to view video media on *wtop.com*. Ms. Duplantis specifically recalls watching video media related to local news in the greater D.C. metropolitan area, and she selects this content because her daughter recently moved to the area.

55.     Ms. Duplantis has had a Facebook account since approximately 2006, which she regularly accesses from her smartphone.. Ms. Duplantis's Facebook account contains personal information regarding her, including her name, business, and other personal details.

56.     Plaintiff never consented, agreed, authorized, or otherwise permitted Hubbard to disclose her Personal Viewing Information to Facebook. Plaintiff has never been provided any written notice that Hubbard was disclosing its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of her Personal Viewing Information. Hubbard nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to Facebook.

57.     Because Plaintiff is entitled by law to privacy in her Personal Viewing Information, Hubbard's disclosure of her Personal Viewing Information deprived Plaintiff of the full set of benefits to which she was entitled as part of being a *WTOP News'* digital subscriber.

## V.     CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this action on behalf of herself and all others similarly situated as a class action under Rules 23(a) (b)(1) ,  (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons in the United States with a digital subscription to an online website owned and/or operated by Hubbard that had their Personal Viewing Information disclosed to Facebook by Hubbard.

59.     The "Class Period" is from January 1, 2013 until the date Hubbard stopped using the Facebook pixel.

60.     Excluded from the Class are Hubbard, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined in 28 USC § 455(b) and their immediate families.

61.   <u>Numerosity</u>. Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are hundreds of thousands of members of the Class widely dispersed throughout the United States. Class members can be identified from Hubbard's records and non-party Facebook's records.

62.   <u>Typicality</u>. Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Hubbard in that Hubbard caused Personal Viewing Information to be disclosed to Facebook without obtaining express written consent. Her claims are based on the same legal theories as the claims of other Class members.

63.   <u>Adequacy</u>. Plaintiff will fairly and adequately protect and represent the interests of the members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Class.  Plaintiff is represented by counsel with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically.

64.   <u>Commonality and predominance</u>. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Hubbard has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Hubbard's wrongful conduct.  Questions of law and fact common to the Classes include:

(a)   Whether Hubbard knowingly disclosed Class members' Personal Viewing Information to Facebook;

(b)     Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

(c)     Whether Hubbard's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

(d)     Whether Class members consented to Hubbard's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B);

(e)     Whether Hubbard was unjustly enriched as a result of its disclosures; and

(f)     Whether the Class is entitled to damages as a result of Hubbard's conduct.

65.     Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VI.     TOLLING OF THE STATUTES OF LIMITATIONS

66.     All applicable statute(s) of limitations have been tolled by Hubbard's knowing and active concealment and denial of the facts alleged herein. Plaintiff and Class members could

not have reasonably discovered Hubbard's practices of sharing their personal viewing content and PII with Facebook until shortly before this class action litigation commenced.

67.    Hubbard was and remains under a continuing duty to disclose to Plaintiff and Class members its practice of sharing personal viewing content and PII to Facebook. As a result of the active concealment by Hubbard, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710

68.    Plaintiff incorporates the preceding paragraphs by reference as if fully set forth herein.

69.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

70.    As defined in 18 U.S.C. §2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

71.    Hubbard is a "video tape service provider" as defined in 18 U.S.C. §2710(a)(4) because it is engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

72.    As defined in 18 U.S.C. §2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

73.     Hubbard knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiff and Class members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. §2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed *WTOP News* video media, including the specific video materials requested from the website.

74.     As defined in 18 U.S.C. §2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff subscribed to a digital *WTOP News* plan that provides video media content to the digital subscriber's desktop, tablet, and mobile device. Plaintiff is thus a "consumer" under this definition.

75.     As set forth in 18 U.S.C. §27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Hubbard failed to obtain informed, written consent under this definition.

76.     In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Hubbard failed to provide an opportunity to opt out as required by the VPPA.

77.     Hubbard knew that these disclosures identified Plaintiff and Class members to Facebook. Hubbard also knew that Plaintiff's and Class members' Personal Viewing Information

was disclosed to Facebook because, *inter alia*, Hubbard chose, programmed, and intended for Facebook to receive the video content name, its URL, and, most notably, the digital subscribers' FID.

78. By disclosing Plaintiff's and the Class's Personal Viewing Information, Hubbard violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

79. As a result of the above violations, Hubbard is liable to the Plaintiff and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Hubbard is also liable for reasonable attorney's fees, and other litigation costs, declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Hubbard in the future.

**SECOND CLAIM FOR RELIEF**
**Unjust Enrichment**

80. Plaintiff incorporates and realleges the above factual allegations by reference.

81. Hubbard acted wrongfully by sharing users' FID and video media information to Facebook without users' consent.

82. Hubbard's practice of sharing users' personal information and video media information with Facebook without their consent through a standalone consent form, caused Hubbard to profit from advertisement revenue it would otherwise not have received.

83. Hubbard's retention of these ill-gotten gains is unjust and inequitable.

84. Plaintiff, on behalf of herself and the Class, accordingly seeks restitution, restitutionary disgorgement, and all other appropriate relief permitted by the law of unjust

enrichment. There is no adequate remedy at law that would provide redress to Plaintiff and the Class or ensure that Hubbard will not deploy the same data practices in the future.

## VIII.      RELIEF REQUESTED

85.      Accordingly, Plaintiff, on behalf of herself and the proposed Class, respectfully requests that this Court:

(a)      Determine that this action may be maintained as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class;

(b)      For an order declaring that Hubbard's conduct as described herein violates the VPPA, 18 U.S.C. § 2710(c)(2)(D);

(c)      For Hubbard to pay $2,500.00 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(d)      For punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

(e)      For prejudgment interest on all amounts awarded;

(f)      For an order of restitution and all other forms of equitable monetary relief; and

(g)      For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit, 18 U.S.C. § 2710(c)(2)(C).

## IX.      JURY DEMAND

86.      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of herself and the proposed Class, demands a trial by jury on all issues so triable.

Dated: September 28, 2022                   Respectfully submitted,

/s/ *Thomas A. Pacheco*

Thomas A. Pacheco
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
15453 Indianola Drive
Derwood, MD 20855
T: (212) 946-9305
tpacheco@milberg.com

Gary M. Klinger*
Alexandra M. Honeycutt*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (847) 208-4585
gklinger@milberg.com

Nick Suciu III*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel: 313-303-3472
nsuciu@milberg.com

Joshua D. Arisohn*
Philip L. Fraietta*
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
       pfraietta@bursor.com

Christopher R. Reilly*
**BURSOR & FISHER, P.A.**
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 679-9006
E-Mail:  creilly@bursor.com

Adam E. Polk (SBN 273000)
Simon Grille (SBN 294914)
Kimberly Macey (SBN 342019)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
sgrille@girardsharp.com
kmacey@girardsharp.com

*\*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*